IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

M. J. L., NEXT FRIEND
EDIE KLEIN                                                          PLAINTIFF

VS.                              CIVIL NO. 05-3067

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                       DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Edie Klein, brings this action on behalf of her minor daughter, M. J. L., seeking

judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social

Security Administration (Commissioner) terminating M. J. L.'s child's supplemental security income

(SSI) benefits under Title XVI of the Social Security Act.

**I. Background:**

Plaintiff filed an application for SSI on M. J. L.'s behalf on April 10, 1997. (Tr. 71-75). By

a decision of an Administrative Law Judge ("ALJ"), M. J. L. was found to be disabled. (Tr. 24-29).

However, pursuant to a continuing disability review, the Commissioner determined that M. J. L.'s

disability ceased on April 1, 2002. (Tr. 30-40). Pursuant to plaintiff's request, a administrative

hearing was held on November 18, 2004. (Tr. 511-529). Plaintiff was present and represented by

counsel. At that time, M. J. L. was eleven years old and being home schooled at the sixth grade

level. (Tr. 516).

The ALJ, in a written decision dated August 2, 2005, found that M. J. L.'s disability had

ceased as of April 1, 2002. (Tr. 8-19). On November 10, 2005, the Appeals Council declined to

review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is

before the undersigned by consent of the parties.  Both parties were afforded the opportunity to file

appeal briefs, however, plaintiff chose not to do so.  (Doc. # 8).

## II.  Evidence Presented:

M. J. L. was found disabled in August 1998, due to Chiari malformation.  (Tr. 12, 24-29).

At age three, she underwent successful surgery to correct this malformation.  (Tr. 12, 279).  Records

also indicate that M. J. L. had a history of asthma, chronic headaches, and constipation.

On February 25, 1999, an MRI of M. J. L.'s spinal cord showed a slight decrease in the size

of the syrinx in the thoracolumbar spine.  (Tr. 292).

On March 18, 1999, Dr. Rosalind Abernathy, M. J. L.'s allergist, indicated that M. J. L. was

continuing to make progress with her spinal cord problem.  (Tr. 292).  Dr. Abernathy noted that M.

J. L. had experienced some asthma exacerbations since her last visit.  As such, she prescribed her

another Aerochamber, as well as Tilade and an Albuterol MDI.  Dr. Abernathy directed M. J. L. to

take two puffs of Albuterol before her exercise periods at school to see if that would prevent her

wheezing.   She also prescribed Rhinocort, Hydroxyzine, and Benadryl.  (Tr. 292).

On June 14, 1999, M. J. L.  underwent a full psychometric evaluation.  (Tr. 296).  Testing

revealed that M. J. L. possessed a normal I. Q.  However, testing did indicate that she was somewhat

distractable so it was recommended that she be seated in the front of the classroom.  The examiners

also recommended that M. J. L. only work on her homework for fifteen to twenty minutes at a time

taking five to ten minute breaks between work sessions.  (Tr. 296-297).

On February 22, 2000, M. J. L. was seen by Dr. Kenan Amautovic, a neurosurgery resident

at Arkansas Children's Hospital.  (Tr. 294).  She had reportedly experienced no symptoms related

Chiari Malformation since her last visit.  In fact, M. J. L.'s choking and gagging symptoms had

AO72A
(Rev. 8/82)

significantly decreased and her headaches were now only occasional.  An examination revealed normal motor strength in both upper and lower extremities.  Further, an MRI revealed satisfactory Chiari decompression with a decreased syrinx.  (Tr. 294).

On March 30, 2000, Dr. Abernathy noted that M. J. L. had very little asthma.  (Tr. 289).  She did, however, give her a prescription for Flovent 44, the lowest dosage, and suggested that she take two puffs twice per day with her new blue Aerochamber.  (Tr. 289-290).

On December 11, 2000, M. J. L.'s asthma remained "well controlled."  (Tr. 282).  No acute coughing or wheezing attacks were reported.  M. J. L. indicated that was taking two puffs of Albuterol before recess and was able to freely participate in activities.

On March 13, 2001, Dr. Tim Burson, a pediatric neurosurgeon, evaluated M. J. L.  (Tr. 279).  From a Chiari decompression standpoint, he found her to be doing very well.  He found no evidence of symptoms attributable to a recurrent Chiari.  An MRI of her head and cervical and thoracic spine revealed a syrinx with good decompression of the Chiari Malformation and a good CSF space around the area.  (Tr. 279).

On April 30, 2001, Dr. Emanuel Siaw, a pediatric gastroenterologist, examined M. J. L.  (Tr. 273).  Based on his examination and abdominal x-rays, he diagnosed M. J. L. with functional constipation with encopresis.  (Tr. 274).  Due to the chronicity of her symptoms and her poor response to therapy, Dr. Siaw scheduled M. J. L. for a barium enema to rule-out any underlying colonic obstructive lesions such as Hirschsprung's disease.  He also ordered lab tests to check here electrolytes, since she had been on Miralax for an extended period of time.  Dr. Siaw then instructed the plaintiff to wean down M. J. L.'s dosage of Miralax and to begin her on Metamucil wafers.  (Tr. 274).

AO72A
(Rev. 8/82)

On June 4, 2001, a barium enema revealed nothing to suggest Hirschsprung's disease.  (Tr. 268).  It did, however, show evidence of constipation.  (Tr. 268).

On June 8, 2001, M. J. L. was said to be doing "quite well" with regard to her asthma.  (Tr. 267).  Dr. Abernathy noted that she had not experienced any acute wheezing at home and had experienced only three episodes at school requiring the use of her MDI.  In fact, pulmonary function studies performed on this date were completely normal.  (Tr. 267).  Records do reveal, however, that M. J. L. was frequently treated for sinusitis and upper respiratory infections.  (Tr. 423-427).

On January 23, 2002, claimant followed-up with Dr. Siaw.  (Tr. 253).  His notes indicate that she was last evaluated on November 20, 2001, at which time her constipation related symptoms had significantly improved.  However, he determined that there was a significant behavioral component to her symptoms and advised her mother to consult with a child psychologist.  At the time of her January 2002 appointment, M. J. L's mother had not had such a consultation.  She reported that M. J. L. was doing fairly well but continued to experience significant constipation with only small amounts of stool every three days.  She was not aware of any recent fecal soiling episodes but stated that M. J. L. was no longer showing her underpants to her mother.  Plaintiff indicated that M. J. L. was also non-compliant with toilet sits.  Dr. Siaw diagnosed M. J. L. with chronic constipation with recent worsening of her condition due to noncompliance and behavioral issues.  He continued her on the Miralax and also prescribed Dulcolax.  In addition, Dr. Siaw scheduled her for an appointment with Dr. Janine Watson of the Child Psychology Division to address her behavioral issues.  (Tr. 253).

On May 23, 2002, M. J. L. was again examined by Dr. Burson.  (Tr. 247-248).  Her mother reported that M. J. L. was losing weight, having swallowing difficulty, and was experiencing urinary and bowel incontinence.  Dr. Burson's examination showed M. J. L. to be awake, alert, and moving

4

all extremities equally.  M. J. L. had a normal gait with no long tract signs, no clonus, and no Hoffman's.  M. J. L.'s pupils were equally round and reactive to light, and extraocular muscles were intact.  M. J. L. had normal gag and an upgoing uvula that was symmetric.  An MRI showed a decrease in the size of the her syrinx with no real change and a good Chiari decompression.  Dr. Burson recommended that a swallowing study be performed.  (Tr. 247).  He also recommended that claimant continue with her current laxative schedule and regular toilet sits, utilize bladder retraining exercises, increase fluids, and increase her calorie intake.  (Tr. 248).

On June 12, 2002, claimant underwent pulmonary function studies due to complaints of a chronic cough.  (Tr. 241-246).  Pulmonary function tests were "completely normal."  An examination revealed boggy and swollen nasal turbinates with clear drainage.  Further, sinus and chest x-rays were negative.  (Tr. 241-246).  Accordingly, claimant was diagnosed with a chronic cough. The doctor indicated that this could be consistent with cough variant asthma but stated that claimant continued to be symptomatic despite the use of Flovent and Albuterol.  (Tr. 241).

On July 17, 2002, claimant was noted to have a full range of motion in her neck and extensions.  (Tr. 227).

A swallowing study was performed on August 7, 2002, by Amy Schluterman, a Speech/Language Pathologist.  (Tr. 238-240).  During the swallowing study, M. J. L. was observed to have adequate oral motor skills for functional control, preparation, and propulsion of the bolus. With thin liquid, pudding, and solid, M. J. L. had a safe swallow with no penetration or aspiration. It was determined that M. J. L. had no greater risk for aspiration than her age matched peers.  (Tr. 238-240).

AO72A
(Rev. 8/82)

On November 27, 2002, M. J. L. was seen by Dr. Siaw for a follow-up consultation regarding chronic constipation with encopresis. (Tr. 411). Dr. Siaw reported that M. J. L. had last been seen on January 22, 2002. At that time, M. J. L. had begun taking Dulcolax and had been referred to the Child Psychology Division to address behavioral issues. On this visit, M. J. L.'s mother reported that M. J. L. was doing "quite well." She was reportedly having fairly consistent bowel movements but sometimes went two to three days between bowel movements. Although M. J. L.'s appetite was reported to be poor, her weight was stable. On examination, Dr. Siaw noted that M. J. L. was well appearing, well developed, well nourished, well hydrated, and in no acute distress. M. J. L.'s abdomen was soft, nontender, and nondistended with normal bowel sounds and no palpable masses. Her neurological examination was also grossly intact. Dr. Siaw opined that M. J. L. was doing well. (Tr. 411).

On December 4, 2002, Dr. Stephen Whaley competed a childhood disability form. (Tr. 309-314). After reviewing M. J. L.'s medical records, he concluded that her impairment was non-severe. (Tr. 309).

M. J. L. again followed-up with Dr. Siaw on May 27, 2003, and reported that she was doing well. (Tr. 405). She was having bowel movements daily and had gained weight on a normal diet. A physical examination revealed no abnormalities. Dr. Siaw indicated that M. J. L. appeared to be doing well on her current medication regimen. (Tr. 405). Records indicate that M. J. L. continued to require medication and behavioral therapy to ensure proper bowel functioning. (Tr. 393-394, 404-406, 464-466, 471-472).

On June 2, 2003, M. J. L. was seen by Dr. Missy Graham in the ACH Allergy/Immunology Clinic for a follow-up concerning her chronic cough. (Tr. 398-399). She reported that the Albuterol

6

did help with her cough.  Allergy tests were negative and sinus and chest x-ray results were consistent with asthma.  Pulmonary function tests revealed no change in pulmonary functions.  As such, she was assessed with a chronic cough and switched from Flovent to Advair.  (Tr. 398).

On June 30, 2003, M. J. L. was evaluated for chronic headaches.  (Tr. 395).  As a result, she was placed on Elavil and Topamax.  (Tr. 395).

On December 1, 2003, M. J. L.'s treating physician, Dr. Stephen Maes completed an RFC assessment.  (Tr. 392).  He indicated that M. J. L. had less than marked cognitive/communicative limitations and marked social and personal limitations.  It was his opinion that she met listing 105.00 and was functionally equal to listing 112.00.  (Tr. 392).

On January 21, 2004, M. J. L. underwent a mental status evaluation by Dr. Nancy Bunting.  (Tr. 416-420).  Dr. Bunting noted that M. J. L. was appropriately groomed and dressed.  Dr. Bunting described M. J. L. as shy, serious, cooperative, and anxious.  She found that M. J. L.'s thoughts were logical, organized, and on topic and that she was able to communicate effectively.  M. J. L. denied any hallucinations or delusions and reported that she liked to do creative things with paper and clay.  Further, M. J. L. reported that she got along with everyone in her family except her 13-year old brother, who pushed and grabbed her, and that she could care for herself.  M. J. L.'s mother stated that M. J. L. was expected to pick up her room, dry the dishes, and sometimes clean the bathroom.  Dr. Bunting observed no physical problems or limitations.  In fact, M. J. L. demonstrated no problems with concentration, persistence, or pace and possessed an estimated I. Q. greater than eighty.  As such, Dr. Bunting assessed her with an adjustment disorder/depressed.  She also estimated M. J. L.'s Global Assessment of Functioning (GAF) at fifty-five.  (Tr. 416-420).

7

M. J. L. underwent an abdominal ultrasound on April 23, 2004, which Dr. Robert Morris read as normal.  (Tr. 421).  Pulmonary function tests performed on M. J. L. on June 9, 2004, by Dr. Robert H. Warren were also normal.  (Tr. 462).  A further abdominal study on September 21, 2004, showed only constipation.  (Tr. 461).

M. J. L. was evaluated by Dr. Harrison on March 8, 2005.  (Tr. 501-509).  M. J. L.'s mother reported to Dr. Harrison that M. J. L. had done "very well" with home schooling, which she had been involved in since the fourth grade.  M. J. L.'s mother did not believe that M. J. L. had any attention deficit disorder problems, although she did note it was sometimes difficult to keep her on task.  M. J. L.'s mother also reported that M. J. L.'s problems with her Chiari malformation seemed stable, that her daily headaches were better on medication, that her encopresis was manageable on medication, and that her asthma and allergies were stable.  M. J. L.'s mother reported that M. J. L.'s problem staying on task was less than marked, and that M. J. L. had no limitation in interacting and relating with others, moving about, manipulating objects, caring for herself, and in her health and physical well being.  (Tr. 502).

Dr. Harrison's examination showed M. J. L. to have a healthy appearance.  The claimant's ability to articulate words was good, and her speech was understandable.  Lungs and breath sounds were equal and clear.  M. J. L.'s abdomen was soft with no hepatosplenomegaly.  The remainder of her examination was also within normal limits. Dr. Harrison assessed her with Chiari Malformation that had been successfully treated with decompression surgery, a stable history of syrinx, and chronic encopresis, chronic daily headaches, and asthma that were all managed by appropriate specialists. He noted that M. J. L. was doing well with home schooling.  and concluded that she had a normal ability to engage in age appropriate activities of daily living.  (Tr. 503-509).

8

Dr. Harrison also completed a "Childhood Disability Assessment Form," in which he concluded that M. J. L. had no limitations regarding her ability to interact and relate to others, move about and manipulate objects, care for herself, or care for her own health and well being. Dr. Harrison further concluded that M. J. L. had less than marked limitation in acquiring and using information and attending and completing tasks. (Tr. 510).

## III.  Standard of Review:

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(c)(i); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

9

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

10

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3).

## IV. Discussion:

In the present case, the ALJ determined that the facts suggested that M. J. L. had no limitations in the areas of acquiring and using information, interacting and relating with others, moving about and manipulating objects, and caring for herself. (Tr. 16-17). In the domains of attending and completing tasks and health and physical well being, the ALJ determined that M. J. L.'s limitations were less than marked. (Tr. 16-18). We will examine each domain separately.

First, the ALJ found that M. J. L. had no limitations with regard to acquiring and using information. (Tr. 16). We note that M. J. L. was being home schooled by her mother and that her mother reported that she was doing very well. (Tr. 501-509). In fact, psychological testing revealed that M. J. L. had an estimated I. Q. of greater than eighty and an ability to communicate effectively. (Tr. 296, 416-420). There is no evidence to indicate that M. J. L. experienced any problems learning new principles or applying new principles learned. Dr. Bunting found her thoughts to be logical,

11

organized and on topic.  (Tr. 416-420).  Therefore, although Dr. Maes and M. J. L.'s mother indicated that M. J. L. had marked cognitive/communicative limitations, this assessment is not supported by the overall medical record. (Tr. 392).  As such, we find substantial evidence to support the ALJ's conclusion that M. J. L. has no limitations in this area of functioning.

With regard to attending and completing tasks, the ALJ found M. J. L. had less than marked limitations.  (Tr. 16).  He noted that M. J. L.'s mother had reported some difficulties keeping her on task.  Further, a psychometric evaluation conducted in 1999 indicated that M. J. L. was somewhat distractable.  (Tr. 296-297).  There is, however, no evidence to indicate that M. J. L. suffers from attention deficit hyperactivity disorder.  In fact, plaintiff even rated M. J. L's limitations as less than marked in this regard.  (Tr. 502).  Therefore, as we can find no evidence of marked limitations within this domain, we find that the evidence supports that ALJ's finding of less than marked limitations.

The ALJ also found M. J. L. had no limitations with regard to interacting and relating to others.  (Tr. 16).  With the exception of M. J. L.'s thirteen-year-old brother, there is no evidence in the record to show that M. J. L. has any problems getting along with others.  (Tr. 416-420).  While we do note Dr. Maes assessment of marked limitations in this domain of functioning, we can find no evidence to support his assessment.   M. J. L.'s mother even indicated that M. J. L. had no limitations in this domain.  (Tr. 503-509).  Therefore, we find substantial evidence supporting the ALJ's determination that she had no limitations in this area of functioning.

With regard to moving about and manipulating objects, the ALJ also found M. J. L. had no limitations.  (Tr. 17).  Physical examinations have documented no limitations in M. J. L.'s extremities.  (Tr. 227, 247-248, 294, 501-509).  We note that plaintiff does not contend that M. J. L. has any limitations in this domain and we can find none in the record.  (Tr. 416-420, 501-509).

12

Therefore, based on this evidence, we conclude that the ALJ properly determined that M. J. L. had no limitations with regard to her ability to move about and manipulate objects.

In addition, the ALJ found that M. J. L. had no limitations in her ability to care for herself. (Tr. 17). Dr. Harrison concluded that she had a normal ability to engage in age appropriate activities of daily living. (Tr. 503-509). M. J. L. even stated that she could take care of herself. (Tr. 416-420). Further, plaintiff reported to Dr. Bunting that M. J. L. picked up her room, dried the dishes, and sometimes cleaned the bathroom. Accordingly, we find substantial evidence to support the ALJ's conclusion with regard to this area of functioning.

Finally, with regard to health and physical well-being, the ALJ found M. J. L. had less than marked limitations. (Tr. 17). The ALJ noted that M. J. L. had undergone surgery for a Chiari Malformation at age three and had been diagnosed with asthma, chronic constipation, and chronic headaches. However, he also noted that plaintiff's surgery was successful and that recent examinations had revealed no evidence of symptoms related to her Chiari Malformation. (Tr. 238-240, 279, 292, 294). Further, the ALJ acknowledged the fact that M. J. L. had been prescribed medication to treat her asthma, chronic constipation, and chronic headaches and seemed to be responding well to those medications. (Tr. 267, 282, 289-290, 292, 398-399, 405, 411, 421, 462). There was no evidence to indicate that M. J. L.'s diagnoses had required hospitalization. In fact, the medical records showed that M. J. L.'s condition had actually improved since she had been found disabled. Therefore, substantial evidence supports the ALJ's finding that M. J. L. has less than marked limitations in the area of heath and physical well-being.

13

**V.  Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this <u>13th</u> day of December 2006.

<u>/s/ Beverly Stites Jones</u>
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE

14